Good morning. Our first case today is 2012-1338, Apple v. ITC. Mr. Rosencrantz. Good morning, Your Honors. This is the Court. Josh Rosencrantz representing Apple. Your Honors, I'd like to spend the vast majority of my time this morning focusing on validity. And if I can sneak in a minute at the end on the 828 patent, I'd like to try to do that. The 607 patent that the ITC invalidated was Apple's first touchscreen patent. It taught a key invention that drove the iPhone and then the iPad phenomenon. Apple claimed something that no one else had ever done. I'm reading directly from the claims. The patent claims the ability on a, quote, transparent screen to, quote, detect multiple touches that occur at the same time. Same time multi-touch. The ITC invalidated this patent. Which claim are you reading from? You said you're reading from the claims? From both Claim 1, Your Honor, and Claim 10. They both have exactly the same. And just to be sure, you're on the 607 patent. I am, yes, Your Honor. And where is this language about the transparent screen that you're talking about? It is the very first sentence of the preamble. A touch panel comprising a transparent capacitive sensing medium. Oh, so when you said transparent screen, you were not quoting from Claim 1 like you suggested. Oh, I'm sorry. Transparent was a quote. So let me do this again. Transparent, and then it's got a, quote, detect multiple touches, and then later on that occur at the same time. Now the ITC invalidated this patent on the basis of two prior art references. One was an article about an opaque screen with a wish list at the end. Maybe we can go transparent. The second was a patent that was not designed to do, and in fact said that it could not do, what the 607 patent claims. And certainly neither one of them enabled the 607 patent. Only Apple figured out same-time multi-touch. And it's telling. The first reference you just spoke about, that's a SmartSkin. Yes, Your Honor, and that's on the obviousness side. And then the second one is Persky. Now it's telling. SmartSkin was out for five years before Apple came out with its invention. Persky had been submitted four years earlier. In that intervening time, no one else had figured out same-time multi-touch. But the moment Apple unveiled its invention, we all know what happens. Why isn't the reference to a transparent screen in the SmartSkin reference a suggestion or a teaching? Well, Your Honor, it is a wish list. It says one day with future work we might be able to figure out how to do. You call it a wish list. Somebody else would call it a suggestion. Why isn't it a suggestion in the sense of 103? The reason, Your Honor, is that it's not easy to do. So let me explain. And this relates both to SmartSkin and anticipation, Persky. I'll start with Persky, but this relates to both, Your Honor. It is simply not an easy thing to take copper wire. So it's one thing to do multi-touch with copper wire in an opaque medium. To change that copper wire into ITO is a very, very difficult thing to do, to implement. The reason is copper is highly conductive. It is the conductive circuit of choice. ITO has worn 100 the conductivity. That means the electrons slide through. Well, let me stop you because you said I'm going to start with Persky. But I didn't understand this to be your argument, Grace, with regard to Persky. I understood your argument to me whether there's written description support in the parent and for you to be focusing on whether it applies and closes multiple touches simultaneously, the pinching and stuff. And so I didn't understand your copper discussion that you're giving now to be relevant at all to anything you said about Persky. Am I misunderstanding? I think you are, Your Honor, and it's my fault. Let me explain why it's relevant. Persky is actually a great example of why it's so hard to do what Apple claims and what Persky refers to but does not. Well, what is it that you think Persky lacks? The only thing I understood from your brief was the multiple touches in the algorithm. You thought the algorithm wasn't sufficiently disclosed in Persky to effectuate the multiple touches in a timely fashion, a fast enough fashion. Isn't that at the heart of your argument? I mean, isn't that exactly your argument? Am I misunderstanding you? No, no. Let me rephrase it, Your Honor, but I think Your Honor is correct. What Persky does not teach is what I referred to earlier from the claim language as same-time multi-touch. Persky does make a reference. And by the way, let me just back up. Persky was not even trying to do same-time multi-touch. In paragraph 14, lines 18 and 19, Persky says, this algorithm is preferably able to detect more than one finger touch at the same time. Yes, I do. So it at least purports to disclose an algorithm which does exactly what you're saying it doesn't do. Your Honor, I was just going to say it does refer to that. It does say that it is preferably able to do it. And in the next three paragraphs, Persky explains that he actually didn't figure out how to do it. So let me just walk through it. Your Honor was correct to refer to Persky as saying at the same time, multiple touches at the same time. That was the only time Persky ever says at the same time. You go down to the next. What happens is Persky describes three methods, three embodiments, and not a single one of them does multi-touch at the same time. So it says when you read on, the first method is the slower method. It's the only one the ALJ relied upon. It says, and this is lines 37 to 38, it enables... What column? Column 14. Column 14. The only column in Persky that's relevant, column 14. It says on lines 37 to 38, this method enables the detection of multiple finger touches. He doesn't say at the same time. Now why doesn't he say at the same time? Because you move up a sentence earlier at line 31, he says there's a disadvantage to this method. It has too many steps, literally a hundred times as many steps to do Persky's first method as it is to do Persky's faster method. The faster method, now at line 53, he says, has a different problem. It leads to ambiguity. Now ambiguity is the opposite of multi-touch, same-time multi-touch. And even if Persky did disclose, did purport to do same-time multi-touch, he certainly didn't enable it. And this is the important point to stepping back from that. Part of the problem is, I mean, we have this case law, I didn't even know it existed until I got to this case, that says these patents for anticipation purposes are presumed to be enabling for everything they disclose. So to the extent that he is purporting to disclose more than one finger touch at the same time, and an algorithm that effectuates that, I have to presume that this patent is enabling for that purpose under our law. So, I mean, I have to get around that. I agree, Your Honor. So, well, two ways to get around it. One is, he doesn't actually disclose it. He says it's a preference and then explains that he can't do it. And the second is, it isn't... Why did he say he can't do it? Well, this is just what I was trying to walk through. What he says is, on the slower method, it is multi-touch, but he doesn't say at the same time. But he doesn't say not at the same time. And right above that, he had said, preferably able to detect more than one finger touch at the same time. So, what makes you think that when he later talks about multiple fingers, he's now not talking about it at the same time? Well, because he says that the disadvantage here is that it's so slow. And more specifically... It's slow, but it doesn't mean it doesn't do it. Right, so then let me get to the enablement piece. It is a presumption, but it's a rebuttable presumption. There was no testimony that this device actually worked the way Your Honor suggests Persky says it worked. The only testimony in the record was that it didn't work. Only our expert analyzed what Persky supposedly claims to have achieved. And by the way, he doesn't even claim it. If he had created same-time multi-touch, he would certainly have claimed it. But he doesn't even claim it. And so our expert, Dr. Subramanian, goes on at length and explains why it is that Persky does not achieve what Your Honor suggests that Persky describes. Now... It seems to me... You're talking in Persky about different detection techniques at different times, but we don't know exactly what we're talking about in terms of time. Are we talking about the difference between 1 ten-thousandth of a second and 1 ten-millionth of a second? We're talking about the difference of milliseconds and then orders of magnitude less than milliseconds. No matter what system you are talking about, including Apple's system, there is a difference in time. There is indeed, Your Honor. Between the first scan and the second scan of two different touches. So this is kind of all relative, isn't it? It is, but the relative difference matters. The 607 patent, the specification refers to at the same time meaning from the perspective of the viewer. But that's what I'm getting at, because perhaps there isn't much of a consumer perception if you're talking about a difference between 1 ten-thousandth of a second and 1 ten-millionth of a second. And that is, Your Honor, what Dr. Subramanian explains. He explains that the consumer will see the difference between the product with Apple's algorithm and its circuitry, which it had to redesign when it went from copper to ITO, and what Persky describes, or supposedly describes. Now, Dr. Subramanian, did he only look at the algorithm in the description at column 14, line 20 through 44? Is that what he was testing? No, Your Honor. Dr. Subramanian went through each of the three methods. The second method... The thing right after that at column 44 says a faster approach is to apply the signal to a group of conductors on one axis, and this seems like exactly how the Apple product works. A group can comprise any subset, including all the conductors in that axis, and look for each signal at each one of the conductors on the other axis. Isn't that exactly how the Apple product works? Isn't that how the Apple algorithm actually works? What the Persky patent says next is there's a problem. No, wait for my question. Isn't that exactly how the Apple algorithm works? That is how the Apple algorithm works, but the actual product works differently. Well, who cares? We're talking about Apple's product. There's not an issue in this. Well, no, I'm sorry. The product that Apple claimed, the invention that Apple claimed... Who cares what product Apple claimed? All we care about is the claim and the disclosure in that specification, and that disclosure comports identically. It does not, Your Honor. Apple claimed a product that does multi-touch at the same time and that can accurately detect different touches. Persky says in his second method, which, by the way, the ALJ did not rely upon, that there's a problem with that one. Ambiguity. Now, ambiguity is the opposite of multi-touch. The reason Apple's invention was so important, it explains in the specification, is because other products out there, the prior art, had the ambiguity. And let me just... I know I'm running out of time, but I do want to focus for a moment on the objective factors, at least with respect to smart skin, but it also completes the story. No one else figured out how Apple's... how to achieve what Apple claimed. No one else. And the moment Apple came out with its product, you had this massive praise in the market, Apple's magic touchscreen. It was the invention of the year, for Time Magazine, which references specifically the touchscreen. There was enormous imitation by others. Now, if Persky had actually disclosed and enabled what Apple had described ultimately in the 607, the world would have been doing that way earlier. And, of course, I haven't even mentioned the commercial success. Before you go there, counsel, let's go back to the smart skin article that Sony had published prior to the issuance of the Apple patent. And I'm going to A13603, Conclusion and Direction for Future Work, what we're calling a wish list, or a prerequisite wish list. It says, Use of transparent electrodes. A transparent smart skin sensor can be obtained by using the indium tin oxide, or a conducive polymer, the ITO. Then it goes on and describes seeking now transparent, conducive materials. Now, it seems to me that this is a little bit more than a wish list. Isn't this almost a plan of action for Placida that's directing Placida to the Apple patent to use the ITO? Because that is central to the Apple patent, the ITO. And then also a transparent screen. Well, Your Honor, it is general guidance to use this Court's words, but it is not a teaching. And the reason goes back to what I was saying earlier. It is an enormous chore. It entailed redesigning the circuitry to get from copper wire to get ITO to achieve what copper wire does. And smart skin does not teach how you design that circuitry. Now, I grant you, Apple did not claim that circuitry, but the device has to work. And Apple claimed a device that does do same-time multi-touch in a way that smart skin never taught. Now, I hope to get to just a minute on... No, but I'd like to ask you about commercial success, which is where you were a minute ago. Well, I don't understand. In the lower court, the ALJ opinion really only addressed commercial success. It didn't seem to address your other points in secondary consideration. They clearly were in the record, so I don't understand why that is. But nonetheless, on commercial success, his only conclusion was not that Apple's product wasn't successful, but that you all had not demonstrated a nexus between the success and this particular feature. And in fact, there's some... There's a very cursory expert report that says what the success is attributed to. But here, in your brief, you devote one paragraph to this. You never mention the word nexus. You never explain why his decision is wrong. You only assert, again, the giant numbers for Apple's sales. How have you given us anything at all upon which to reverse him? You address this in one paragraph and don't address the basis for which he rejected your commercial success evidence. What am I supposed to do with that? I'm very disappointed. At the lawyering on this point, because you've got a decent point, but you didn't make the argument. So what do I do? Well, Your Honor, we did make the argument in the reply brief. But let me just answer the question directly. So, first of all, it's not just commercial success. It's also praise. The praise was uniformly directed at most, first and foremost, the touchscreen, Apple's magic touchscreen. And that is in part what drove so much of the commercial success. This was Apple's first touchscreen patent. It was described in the record as the key patent for touchscreens. And then the imitation of others, when Motorola and every other major manufacturer... What does any of this have to do with Nexus? He said that Nexus was attributable to things like iTunes and lots of programming availability on the Apple platform. You didn't even argue here. No, that's incorrect. The success is attributable to this particular aspect. Well, Your Honor, in our reply brief, we did argue that that's incorrect. First of all... It's a little late in the reply brief. Excuse me, Your Honor? It's a little late in the reply brief. Especially when it was the basis of the ALJ's decision. Well, Your Honor, let me just answer the question. So, the ALJ focused on... Sorry, the ALJ drew the testimony from a technical expert who admitted that he had absolutely no basis for which to measure consumer demand. He was a technical expert describing the technology. And we did mention... We did argue in our brief that that is just not competent evidence. And, you know, this Court's precedents on Nexus do not require the Court to do away with common sense. The touchscreen was front and center in the marketing. Front and center in the praise and in the imitation. Not just the touchscreen, but imitating this particular invention. And that provides the Nexus. But that wasn't the only thing that might have driven that success. There were a whole host of things were there not. It was not the only thing. And we've never argued that it's the only thing. But Nexus doesn't require it to be the only thing that drives success. There is no question, I think, from anyone who understands why someone who owns a Mac, which looks just like an iPad, would buy the iPad. It's because of the intuitive way in which the touchscreen works. Can you just address for a minute the mathematically fitting in the lips question? Yes, Your Honor. This is a very, very important patent. And the ALJ adopted a claim construction that no one suggested and that is completely inconsistent with the specification. Apple, Motorola, and the ITC staff all agree below that mathematically fitting in a list means calculating the five parameters from the data themselves. Judge Code agreed. So we're now in this position where we've got two conflicting claim constructions and Judge Code is right. No one suggested that the claims called for the ALJ's two-step process where you somehow first draw an ellipse and then calculate parameters from that ellipse. It actually makes no sense. No one has suggested how in the world you would go about doing it. The preferred embodiment doesn't do it. And everyone agrees that of course the preferred embodiment must at least be covered by these claims. And throughout the specification, what you see is calculating parameters directly from the data. And if you're correct on this, that requires vacating and remanding for a new trial at this point on this patent? Vacating. At a minimum, vacating and remanding for new fact findings from the ALJ who used the wrong construction. Yes, Your Honor. Okay. Let's hear from the opposing counsel. I'll restore three minutes, Your Honor. Thank you, Your Honor. Ms. Valentine? Good morning, Your Honor. May it please the Court. I'd like to just briefly  the anticipation issue on PERSI. As the Court noted, the PERSI patent does not recite any specific speed limitations with respect to how fast the detection must occur. Well, I think Mr. Rosenkranz's argument is the first algorithm disclosed in column 14 is too slow to work and the second algorithm is fast, but admits that it's flawed, that it doesn't work properly because there's ambiguity, which it says, on the rare occasions when multiple searches occur simultaneously at specific locations. So I think his argument is, you know, it may disclose an objective that includes doing this, but it doesn't actually disclose a way of doing it that enables one to fill in the arc. So, why don't you try to focus on that? Yes, Your Honor. So, as Apple admitted itself in its brief at page 28, the algorithms disclosed are nearly identical in the two patents and the fact that the so-called faster method may, as Your Honor noted, occasionally have ambiguity is not relevant to the fact whether or not  multi-touch, which is what is required by the claim language. Again, there is no requirement in the claim as to exactly how fast the multi-touch detection must occur and the faster approach, as Your Honor noted previously, does operate exactly in the same way. So, the so-called speed, which the only disclosure Apple even relies on in the disclosure of the 507 is the parallel sensing method, which operates nearly identically to the faster method in the first. Also related to anticipation is the separate issue, which I understand only pertains to Claim 10, but that is whether or not Morag was incorporated by reference into PERSKI. Is that right? Correct. So, that question actually relates to whether or not the PERSKI provisional is whether the PERSKI patent can claim back to the PERSKI provisional as far as effective reference date. However, Apple waived this argument below. If I don't agree with you this way, let's just get to the heart of the argument because you don't have a lot of time. So, I want to skip you over things. I'm focusing on what I want to hear about. So, why don't you tell me what you understand the standard of law to be with how specific or what you must say in order to claim back to the PERSKI provisional. So, let me read you a standard. From advanced display systems, to incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates by reference and clearly indicate where that material is found in the document. It goes on to say that clearly identifying the subject matter which is incorporated and where it is to be found expressly incorporates the particular part of the reference. So, it's not enough to just say, hey, there might be something else over there you might want to look at. You actually have to identify it with particularity and then say exactly what and where in the reference the important information lies. And my problem is I don't see that being done with regard to Morag. So, let's look at the express language in the PERSKY provisional that incorporates it and see if you can convince me that I'm wrong. Yes, that's right. So, I believe the particular language issue is at 16-149. Yes, ma'am. In the last paragraph where it says, in the present invention, detection of the silos is done in a method similar to the method described in. Similar to the method described in. That's wow. That's amazing. So, this references the specific applications by number. It says both patents describe a sensing device that is capable of detecting multiple physical objects located on top of the flat screen. It goes on to say one of the preferred embodiments is a patent. Are all of those incorporated by reference into a patent? I don't believe so, Your Honor. Of course not. No way, right? But I guess my problem is I don't see that disclosure in an IDS as being in any way significantly different from what is stated here. Most of our incorporation by reference cases, quite frankly, have used the words we incorporate by reference. And so, to go beyond that, you know, beyond that presumption which exists to this, it just seems like a bit of a stretch for me. I don't know. Is there anything in our law that you can point to that  helpful? Do you want to move on maybe to the infringement section for us? Sure. And I'm going to give you a few extra minutes. Okay, thank you. So, as the AOJ did correctly construe the claim limitation mathematically fitting an ellipse to want to mark the ellipse in the first place. And as Motorola's       requires you to be able to determine the ellipse parameters that describe the ellipse in the first place. And so, there are some kind of mathematical fitting algorithms based on some mathematical optimization functions, such as the apply to a pixel group to construct the model. And this is found in the expert report at 18256 in  United States. But when the device undertakes the calculations, isn't the achieving of those calculations also achieving the fitting that we're talking about? We're talking really about a one-step process, not a two-step process, correct? Well, I think that that is  in the preferred environment, Your Honor. In particular, the preferred environment, particularly at 628, starting columns 25, line 61 through 26, line 47, discloses the preferred environment for the test. The parameters of column 25 are actually determined first, and then completely separately, the specification discloses or discusses the ellipse fitting procedure. So the concept of fitting an ellipse is in the specification itself is distinct from the concept of simply finding parameters. And also, one of the inventors, Mr. Elias, stated in his testimony during the hearing, at 3319, line 18 through 3320 at 10, that the ellipse fitting procedure is actually through step 318. And it is only later, in step 19 through 21, that the major-minor axis and the orientation are determined from the ellipse that is fitted. So fitting an ellipse in keeping with both the plain language and in keeping with the specification is a distinct process from simply calculating parameters. That is certainly true. That once an ellipse is fit to determine the approximate shape and shape   ellipse, it is not just a  of the parameters of the ellipse before you touch it. I don't believe so, Your Honor. I think the question is, is it  just calculating parameters that can describe an ellipse? Is it actually doing some sort of optimization model to fit and date ellipse data and then from that you determine the parameters of that ellipse? Is it actually mathematically fitting? So, isn't mathematically fitting more about the parameters and not actually about the  actual ellipse as a starting point? I don't think so, Your Honor. I think the question is, is it fitting? And this term mathematical was added during prosecution because during prosecution the examiner rejected over the set reference saying that you simply do calculations and measure parameters from the data. And the applicants themselves said, no, that's not correct. You have to do this mathematical  procedure, which, again, is, though mathematical certainly can mean, and I think Dr. Wolf explained it, mathematical fitting is applying a mathematical fitting algorithm. Let's look at the pattern for a second and walk through this. It seems like you described it as an apt metaphor because you have to draw the circle first and then find the parameters or is it just about finding the parameters? Let's look at figure 16, if you don't mind. You would say if I understand your   correctly, the image segmentation process which then leads to the parameterized group in figure 18. I understand that. So 241, image segmentation, you think that's drawing the ellipse and 242 is extracting the variable? Correct. That's shown in figure 18 on block 272. The result is the parameterized group. What do you think that means in your view? It would be the parameterized best fit. Is that drawing the picture or is it extracting the parameterized  I don't know. But you realize in the text, and in particular, I'll point you to column 25, lines 54 to 56, it says the step of 272 of the segmentation process is to extract shape, size, and position  the matrix. I think the ALJ correctly relied on the language of the claim, that the mathematical fitting based on the testimony of both experts and the inventors themselves is more than simply performing measurements of the testimony of both experts and the inventors  I    is more than simply performing measurements of the testimony of both experts and the inventors themselves. I think the ALJ is more than simply and the inventors. I think the ALJ the ALJ is more  simply  measurements   of both  the inventors. I think simply performing measurements of both the ALJ is more simply performing measurements of both the inventors and working with the method. In terms of the device, that's exactly what was not going on. That's why the ALJ addressed this issue. The underlying chip and hardware was the only thing that had access to the actual touch data. What this patent is about is to take that touch data and model an ellipse for that touch data so that you can pass that on to other layers and have an accurate model of that underlying touch data. That's why the ALJ said you need to fit in an ellipse because there has to be an attempt to model an ellipse so that it minimally differs from your actual underlying touch data. I realize on appeal this has morphed into this idea that first I draw and then I calculate parameters. That's not what's going on underneath. It seems like that's what the ALJ held the construction was limited to. Now, if you actually read through what he did, it's 68 to 70 of his opinion where he walks through the construction and what the various arguments were. You'll see this again in his infringement treatment where he's walking through and he's trying to figure out what the proper construction is. You can see that that's why he comes to his conclusion is because he comes to his conclusion because what he's trying to say is what you need to have is the minimization of the difference between your model ellipse and the actual underlying touch data. That's what's going on is the model of the ellipse. That's why he said you need to actually fit an ellipse and have the parameters that describe that ellipse so that you don't run into a situation. Let's take an example where the only thing that's calculated is the center. That's all I know. I know where the center of my touch is. Now, something later software having no idea how big that touch is, it could have been a very large touch, it could be a very small touch, and says let me just take that because for my program I want to draw a bunch of circles on the screen where the touches were, so I'll just draw a circle with the diameter of one. You can certainly do that. I can take any information and tell me where the center is and I can draw you a circle. What he said is that is not this pattern because it doesn't have anything to do with modeling the ellipse to the underlying structure. The infringement section of his opinion really got to this issue. They said look, you have a situation where you're calculating the center and you're doing an error, which is just the number of channels that are recording back. So there's no attempt in the accused devices, and this is under either construction, whether it be the  the building itself, that actually took that data and modeled the ellipse to it. Because now what you have is you don't know what the shape of that touch is. So you could have two touches, completely different shapes, that report back exactly the same parameters. So I haven't modeled that  So it's not like on page 64. What you're really talking about is rectangle versus ellipse and how you could end up with the same mathematical parameters that could really fit either of these two shapes. That is correct. That is correct. Is that your argument you're making? Yes. And then he continues on to 65. Isn't it true that none of you, even vaguely, recommended this construction? You said this is a variation of your construction. Your proposed construction was geometric parameters obtained from mathematically fitting an ellipse. What he adopted doesn't sound like a variation of your construction. Sounds like he rejected your construction and came up with his own. Well, he certainly did the formulation he came up with his own. The reason why he emphasized that first part, which is what everybody seems to be debating about, is for the exact reason that I just described. And Apple and the staff seem to have virtually identical constructions proposed to him. Apple was parameters that describe an ellipse and the staff was parameters that describe an ellipse, for example, position, shape, size, orientation, etc. Actually, what you have there is an ellipse and an ellipse. So, in his opinion, he erred in representing what the staff was. No, he did it correct in the body of the opinion. What you're looking at is from the appendix of the proposed construction. So, there's a particular way in the patent from the section you're just reading in the columns. I think Judge Moore's point is correct that the construction that the ALJ arrived at was not proposed by either of the parties. The wording of the construction, absolutely, was not proposed by either of the parties. The concept of the two-step process, was that something that you argued before the ALJ? It was the non-infringement argument. I do not believe that in terms of his application of his construction, that he went through a two-step process. What he was doing was saying, look, I want to have a situation where whatever that touch date is, that there is a touch date. If you look at the infringement determination, I do not believe that that's... He was trying to emphasize this point with his construction that we need to have to that touch date. That touch date exists in one place, that's in the ship, that I need to create a situation  is a touch date. I do not believe that that's a touch date. I do not believe that that is a touch date. I do not believe that that is a touch date. I believe that that  touch date. I do not believe that that is a touch date. And I do not believe that that is a touch date. And if you look at the technology  was being developed and in the 6-6-2 was the more AG which is referred to as the more AG appusp it's is 163. There is one device that is described in the electronics to interpret Okay, I'm not following your point. What is your point? Well, what I'm saying is that is  and that's what Dr. Wolfe pointed to as being No, Dr. Wolfe said a method similar and then he just in a couple of sentences described what the sensing device is in as he understands it in these two applications. He didn't say and I'm incorporating this sensing device by reference or anything else. Oh, you mean in terms of the application itself Right, the application. I'm talking about Dr. Wolfe that was the underlying expert his testimony and one of the things we forget in the IPC Incorporation by reference is a question of law. This is the point upon which you are trying to hit and I totally do not understand the argument that you're making. So, take a second and try to figure it out and say it to me in a sentence if possible. Yes. What I'm saying is that your question was why is the sensing device incorporated through the provisional application? The sensing device that's described In the absence of any words in the provisional that are the typical words that one would use for incorporation by reference which is a question of law and guided by presumptions established in our case law. Right, because it says that I use a similar method and these patents describe that sensing device. The testimony from Is use of words similar? I mean, is that enough in this case? Well, I think it is. It is enough because the method is to use a sensor and then a front end to interpret that along with the digital signal processing in order to determine what the actual touches are. So, yes, I agree and that's the only testimony that we have in the record about this is from Dr. Wolf and I know that Apple has represented that Dr. Wolf had one statement but there were entire there was an entire time chart that gave Apple element by element exactly what the incorporation what it was from the Morag reference that was incorporated Are you talking about the red line that Apple provided? Excuse me? Are you talking about the red line that Apple provided? That was a comparison of the provisional to the issued personal patents so not that but in terms of the proof because remember in the ITC one of the Your expert analyzed what Morag disclosed and why he thinks it's like what they need here. The problem is and I don't have any problem with any of that and I think even they they might not want to but they might say even if we accept everything you are saying right now is true it still doesn't satisfy the need to have expressly incorporated it by reference on page 16149 which you didn't do so your expert detailed element by element analysis of what is disclosed in Morag is all fine and dandy but it's not here it's not part of this patent this is an anticipation reference Maybe Mr. Rosencrantz will say something entirely different but I think that's what he would say No, I agree with you and I think that's what he would say but the reason why I reference Dr. Wood's testimony is because that's the testimony that we have from 1 of ordinary skill in the art reviewing these applications as to what it would be Does 1 of ordinary skill in the art get to apply it on a question of law? Well, certainly it would be like claim destruction how they understand we have to look at this from the perspective of 1 of ordinary skill in the art and so that's the reason for that And so, doctor you're saying he said that when you say a method similar you've incorporated something by reference that it is his personal belief that 1 of ordinary skill in the art that that's enough in this particular art to incorporate something by reference No, that's not what I'm saying your honor because I think that would be incorrect for him to opine and say oh, that's an incorporation by reference that would be a legal question what he opined on is what he understood to be incorporated when I read this 1 of ordinary skill in the art it tells me that I'm going to use this sentence that's what's described Well, that may be his interpretation but the document itself doesn't tell anyone specifically where the information is by page by line by anything it's simply a reference to technology a reference to a sensing device generally isn't it and that according to our precedent that's not enough for us Well, that's why I think it is enough because there's only the 1 it's not a situation and Apple hasn't hinted anything in the Morad reference where there are multiple sensing devices that are described and there's some question as to which one we're talking about The problem I think for you is that this concept of incorporation by reference is not really the same as sort of concepts of teaching or suggestions or things like this in an obviousness context it's either incorporated or it's not it's either identified or it's not and the public is entitled to have some individual documents pages lines text etc. so that people don't have to make judgment calls as to what was intended and I think that's a fair point and I think we do that here and that's given the proceedings for Dr. Wolf to identify what he believed and what he understood from reviewing this to be the sensing device that was referred to and what was incorporated and for Apple never to come back and this is why the labor issue becomes very important they never came back and said here's what we think is not incorporated okay I think we better hear from Mr. Rosenkranz okay thank you I appreciate it thank you Mr. Rosenkranz how about if I give you five minutes because they took a lot more than that but if you don't need to use it all don't feel compelled to I will try to be succinct let me begin by correcting what I said to the court before about Nexus Nexus was all over our opening brief pages 22 to 24 three full pages in captions with the title new touch screen spurred the iPhone's success and so that was in our statement of facts and we're referring back to that in our argument at pages 52 to 53 we discuss the ALJ's point about Nexus we say that he's wrong because he misunderstood Crocs Crocs says that you've got a product that practices and you've got commercial success prima facie case for Nexus and it's up to Motorola then to disprove Nexus which they never even tried to do and then on our reply brief pages 13 to 14 we make that point again and we also refer back to Nexus where do you refer to Nexus on page 52 and 53 in your argument section it begins second the ALJ also erred in holding that the required Nexus between commercial success of the iPhone 4 and the specific features there were quoting covered by the 607 patent did not exist because quote the evidence shows that the iPhone success stems from other product characteristics and we explained and we've already explained in three full pages but doesn't this hinge because you actually don't seem to explain in this section that for example the Nexus for the success is the touch screen as opposed to iTunes or any of the    are available to you and that is the legal interpretation of Crocs and particularly how do you reconcile that with all the earlier cases pre Crocs that say the Nexus  a prominent feature and the other cases were not about obviousness but the main point is that again particularly when you have a feature as prominent as a case of Nexus correct? Yes. So isn't the argument here whether you have to show a Nexus to the device as a whole as opposed to the patented  within a multi-component device? I think that is what Crocs says and particularly when the feature is as prominent as the patented feature. Second point just moving to Kersky if I may. Judge Moore was right. Kersky was about something very different. I mentioned already the on-screen touch board. That is about successive touches. And with respect to the incorporation by reference yes I do embrace everything that Judge Moore said about the law. But I also have to emphasize that Motorola's expert Mr. Wolf if you look at page 18 413 his claim chart he says actually only a portion of Kersky was incorporated by reference. That was the portion that was   The second obviousness about the detection of the stylus we're talking about a completely different portion of the patent. Kersky the ultimate patent goes on at length about what you do with that data in the output device. Third Kersky the ultimate patent goes on at length about what you do with that data in the output device. Fourth Kersky the ultimate patent goes on at length about what you do with that data in the output device. Fifth Kersky the ultimate patent goes on at length about what you do with that   device. Sixth Kersky the ultimate patent goes on at length about what you do with that data in the output device. Seventh Kersky the ultimate patent goes on at length about what you do with that        at length about what you do  device. Ninth Kersky the ultimate patent goes on at length about what you do with that device. Tenth Kersky the     about what you do with that device. I thank all the counsel involved. The oral argument was very helpful to the court today. This case is submitted.